IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LORI M. FRYE, )</br>)</br>Plaintiff, )</br>)</br>v. )</br>)</br>NANCY A. BERRYHILL,[1] )</br>Acting Commissioner of Social Security, )</br>)</br>Defendant. ) | 1:16CV543 |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Lori Frye ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed applications for Disability Insurance Benefits and Supplemental Security Income Benefits on August 20, 2012, alleging a disability onset date of

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

July 30, 2008 in both applications. (Tr. at 12, 240-48.)² Her applications were denied initially (Tr. at 76-105, 144-49) and upon reconsideration (Tr. at 106-143, 152-60). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 161-62.) Plaintiff attended the subsequent hearing on October 7, 2015, along with her attorney and an impartial vocational expert. (Tr. at 12.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act from her alleged onset date through the date of her decision. (Tr. at 24.) On April 1, 2016, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-7.)

II. <u>LEGAL STANDARD</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1993) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

---

² Transcript citations refer to the Sealed Administrative Record [Doc. #8].

scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her amended alleged onset date. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 14.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments: "major depressive disorder, obsessive-compulsive disorder, generalized anxiety disorder, asthma, obesity, diabetes mellitus, hypertension, and goiter." (Tr. at 15.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Id.) As part of the analysis at step three, the ALJ considered Plaintiff's mental impairments and found that Plaintiff had moderate difficulties in concentration, persistence, or pace, mild restrictions in activities of daily living,

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

and moderate difficulties in social functioning. (Tr. at 15-16.) The ALJ then assessed Plaintiff's RFC and determined that Plaintiff

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can occasionally climb stairs and ramps; and never climb ropes, ladders, and scaffolds. The claimant reported she could occasionally bend, balance, crouch, stoop, kneel, and crawl. The claimant should avoid concentrated exposure to pulmonary irritants and workplace hazards. The claimant could occasionally use foot pedals with the bilateral lower extremities; and occasionally push and/or pull with the bilateral lower extremities. The claimant is further limited to simple, routine tasks involving no more than simple, short instructions and simple, work-related decisions with few workplace changes. The claimant could tolerate occasional contact with supervisors, coworkers, and the public; and she could work in proximity to others, but not in coordination with others.

Tr. at 17.

At step four of the analysis, the ALJ found that the demands of Plaintiff's past relevant work exceeded her RFC. (Tr. at 23.) However, based on the vocational expert's testimony, the ALJ determined at step five, that, given Plaintiff's age, education, work experience, and RFC, she could perform other jobs available in the national economy. (Tr. at 23-24.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 24.)

Plaintiff now challenges the ALJ's decision in two respects. First, she argues that her RFC fails to adequately reflect the mental limitations identified at step three of the sequential analysis. Second, she contends that, at step five, the ALJ improperly relied on vocational expert testimony which conflicts with the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. [Doc. #11] at 1.)

      A.    <u>Mental Limitations in RFC Assessment</u>

Plaintiff first challenges the mental limitations in her RFC assessment, arguing that they fail to comply with Social Security Ruling ("SSR") 96-8p as well as the Fourth Circuit's decision

in <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015).  Specifically, Plaintiff argues (1) that the RFC fails to properly account for her moderate limitations in concentration, persistence, or pace, and (2) that the ambiguity of the term "contact" renders the social RFC limitations unsupported by substantial evidence.  The Court addresses these contentions in turn.

        1.        Concentration, persistence, and pace

In <u>Mascio</u>, the Fourth Circuit addressed the question of whether and how moderate limitations in concentration, persistence, and pace found at step two must be accounted for in the RFC assessment.  780 F.3d at 638.  The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work."  <u>Id.</u> (quotation omitted).  This is because "the ability to perform simple tasks differs from the ability to stay on task.  Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."  <u>Id.</u>  The Fourth Circuit further noted that "[p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity.  For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert.  But because the ALJ here gave no explanation, a remand is in order."  <u>Id.</u> (internal citation omitted).

In the present case, as in <u>Mascio</u>, the ALJ found at step three of the sequential analysis that Plaintiff had moderate difficulties in concentration, persistence, or pace.  (Tr. at 16.)  The ALJ also found that Plaintiff had only mild restrictions in activities of daily living and moderate

7

difficulties in social functioning. (Tr. at 15-16.) The RFC then limited Plaintiff to "simple, routine tasks involving no more than simple, short instructions and simple, work-related decisions with few workplace changes. . . . occasional contact with supervisors, coworkers, and the public; and . . . work in proximity to others, but not in coordination with others." (Tr. at 17.) Plaintiff now argues that these limitations fail to adequately address her mental limitations in light of Mascio. However, the Fourth Circuit's decision in Mascio

> "does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision. . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court."

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8-9 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff's moderate limitations in concentration, persistence, or pace in light of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)).

In this case, as in Tolbert, the ALJ sufficiently explained why Plaintiff's limitations in concentration, persistence, or pace were accounted for by the RFC in this case. (Tr. at 17.) First, the RFC in this case is much more detailed than in Mascio, and the hypothetical questions to the Vocational Expert were likewise more detailed. In addition, the ALJ included

8

an extended review of the evidence regarding Plaintiff's mental impairments, with findings regarding the extent of those impairments based on the medical record. The ALJ also made specific credibility determinations regarding Plaintiff's claimed mental impairments. Specifically, in assessing Plaintiff's concentration difficulties as moderate at step three of the sequential analysis, the ALJ recounted statements from a third-party function report completed by Plaintiff's daughter on June 5, 2013, claiming that Plaintiff "could not pay attention for long periods; she does not always finish what she starts; and she struggles with following written and spoken instructions." (Tr. at 16.) However, the ALJ also noted that these assertions contradicted Plaintiff's own statements during a July 25, 2013 consultative exam. At that time, Plaintiff reported that she "could take care of all of her personal needs without assistance" and could "cook meals, wash dishes, vacuum, and mop." (Tr. at 16.) In addition, the ALJ added that, "at the hearing, the claimant testified that she drives 100-150 miles a week to her daughter's college, which usually requires some prolonged concentration." (Id.) As a result, the ALJ found at step three that Plaintiff had "no more than moderate difficulties with regard to concentration, persistence, or pace." (Tr. at 16.)

In later assessing Plaintiff's RFC, the ALJ explained that while Plaintiff did suffer from major depressive disorder, obsessive-compulsive disorder, and generalized anxiety disorder, "the record does not support such severe functional limitations as alleged by [Plaintiff]." (Tr. at 20.) With respect to concentration, persistence, and pace, the ALJ noted that the record contradicted testimony from Plaintiff that she "could not sit or concentrate long enough to have hobbies" and reports from Plaintiff's daughter that Plaintiff "did not do any of the activities or things she used to enjoy." (Tr. at 22, 362.) In particular, the ALJ noted Plaintiff's

9

daily activities during the period at issue, including Plaintiff's efforts to start a cleaning business with her daughter while she "waited on disability," and Plaintiff's ongoing efforts to advertise and market that cleaning business, such as putting up fliers and advertising on Facebook. (Tr. at 16, 21, 22.) The ALJ noted that Plaintiff's "ability to advertise and look for work calls into question whether [Plaintiff] is as disabled as she alleges." (Tr. at 21.) The ALJ also noted that the treatment records show that Plaintiff played monopoly with her family, went out with her sister for her birthday; played cards with her sister for an extended period, went to a concert with her daughter, went to her grandson's school events, and enjoyed volunteering at a school. (Tr. at 16, 21, 22, 622, 627, 628, 719, 721, 723, 732.) In addition, the ALJ also noted that Plaintiff made weekly trips that involved driving 100-150 miles to visit her daughter. (Tr. at 17.)

Finally, the ALJ also recounted that Plaintiff's health care providers consistently characterized her attention, concentration, memory, and judgment as within normal limits throughout the period at issue. (Tr. at 20, 21, 497, 510, 528, 531, 534, 545, 581, 594, 604, 617-18.) The ALJ noted that Plaintiff was seen in August and September 2008 after her fiancé was killed in a car accident, and medical records from November 2008 reflect that she was started on various antidepressants and anti-anxiety medications and "her condition improved." (Tr. at 20, 483-84.) Plaintiff sought mental health services two and a half years later, in May 2011, when she was seen for an assessment (Tr. at 504-515), and in August 2011 when she underwent a psychiatric evaluation and was started on medication for obsessive-compulsive disorder (Tr. at 20, 536) by her psychiatrist, Dr. Griffin. The ALJ noted that at her next visit with Dr. Griffin in September 2011, Plaintiff "reported that she was doing 'very well'" and "a

10

mental status examination revealed [Plaintiff's] attention/concentration were within normal limits, judgment was within normal limits, recent and remote memory were within normal limits, and motor abnormalities/gait/strength were within normal limits." (Tr. at 20, 533.) The ALJ noted that these records were "inconsistent with [Plaintiff's] allegation that her ability to concentrate was extremely impaired." (Tr. at 20.) Plaintiff returned to see Dr. Griffin nine months later in June 2012, and the ALJ noted that according to the treatment note from June 18, 2012, Plaintiff failed to take her medication because of the $4.00 cost for filling the prescription, but the ALJ noted that she had earnings of $5,803 in self-employment, and the ALJ found that if Plaintiff's "psychiatric symptoms were not severe enough to motivate her to use her funds to purchase her medication, it is difficult to accept her assertion that they are disabling." (Tr. at 21, 531.)[5] The ALJ also noted that at a consultative examination several months later, on January 29, 2013, the consultative examiner observed that Plaintiff "had a pretty good ability to sustain concentration and attention." (Tr. at 21, 617.) Additional records from 2013, discussed by the ALJ, reflect that Plaintiff continued to suffer from anxiety and depression, but her memory, attention, and concentration were intact and the treatment records reflect her involvement in various activities as noted above. (Tr. at 21, 622, 627, 628, 719, 721, 723, 731, 732, 735.) The ALJ also addressed the medical opinions and found the opinions of the State Agency Psychological Consultants, Drs. Jonathan Mayhew and William Farrell, were consistent with "lack of inpatient psychiatric hospitalizations and physical examinations in the record." (Tr. at 22.) However, the ALJ also "gave consideration to the

---

[5] The ALJ also noted that the next month, in July 2012, Plaintiff told Dr. Griffin that she still was not taking the anti-depressant/anti-anxiety medications (which were provided to her in multiple "starter packs" at the last appointment) because she said she was "taking so many medications." (Tr. at 21, 527, 531.)

11

claimant's subjective complaints and included additional limitations" (Tr. at 22), as reflected in the RFC.[6]

Thus, unlike a case where the ALJ finds mental impairments and then limits Plaintiff to "unskilled" work without further explanation, here the ALJ considered Plaintiff's mental impairments at length, noted the inconsistencies between Plaintiff's contentions and the abilities reflected in the record including specifically as to her attention and concentration, set out the relevant findings from the medical records and opinions, made credibility determinations, "specifically tailored the [RFC] to take into account all of [Plaintiff's] functional limitations for which there was support in the record," and adopted a detailed RFC specifically providing for "simple, routine tasks involving no more than simple, short instructions and simple, work-related decisions with few workplace changes. . . . occasional contact with supervisors, coworkers, and the public; and . . . work in proximity to others, but not in coordination with others." (Tr. at 17, 18.) This detailed analysis and RFC determination provides sufficient basis for review by the Court and is supported by substantial evidence.

---

[6] Plaintiff does not point to any evidence that was not considered and addressed by the ALJ that would support a greater restriction in Plaintiff's RFC, and none of Plaintiff's medical providers gave any indication that Plaintiff's mental impairments would preclude her from working, other than during the two month period in 2008 immediately after her fiancé died. (See Tr. at 488 (August 2008 treatment note reflecting that Plaintiff should "[s]tay out of work for two additional weeks – until 08/25/08"); Tr. at 710 (September 12, 2008 treatment note reflecting that Plaintiff was suffering from depression and anxiety since the death of her fiancé in July and "needs to be out of work from 9-5-08 until 9-22-08"); see also Tr. at 480 (January 8, 2009 treatment note reflecting that Plaintiff had been out of work for 9 days due to abdominal pain and gastrointestinal symptoms, and advising a return to work the next day, on January 9, 2009)).

2. Social limitations

In a second Mascio argument, Plaintiff similarly contends that the ALJ failed to properly account for Plaintiff's moderate social limitations when formulating the RFC. Specifically, Plaintiff contends that although her RFC provides for "occasional contact with supervisors, coworkers, and the public," the ALJ failed to specifically define the term "contact." (Pl.'s Br. at 8.) However, as Defendant correctly notes, other cases in this District have previously rejected the contention that the ALJ must define "contact" beyond its common, everyday meaning when presenting a hypothetical question to a vocational expert. O'Brien v. Colvin, No. 1:15-CV-536, 2016 WL 2755459, at *5 (M.D.N.C. May 11, 2016), report and recommendation adopted, No. 1:15-CV-536, 2016 WL 5660296 (M.D.N.C. Sept. 30, 2016). Moreover, in the present case, the vocational expert noted no confusion regarding the ALJ's hypothetical question or the meaning of the word "contact," and Plaintiff's counsel did not raise the issue or ask for clarification at the hearing, indicating that the vocational expert, the ALJ, and counsel all understood the term as commonly used. Accordingly, this contention fails to provide a basis for remand.

To the extent the Plaintiff otherwise generally contends that the ALJ failed to adequately address or discuss the effect of Plaintiff's social limitations in setting the RFC, the Court concludes that, as discussed above, the ALJ made specific determinations in the RFC with respect to Plaintiff's social limitations, discussed Plaintiff's contentions and the medical evidence at length, discussed Plaintiff's activities reflected in the record, made credibility determinations, and set out an explanation for those determinations. The RFC determination then specifically addressed the social limitations by providing for "occasional contact with

supervisors, coworkers, and the public; and . . . work in proximity to others, but not in coordination with others." (Tr. at 17, 18.) The RFC determination thus provides a sufficient basis for review by the Court and is supported by substantial evidence under the standard set out above.

B. Vocational Expert Testimony

Finally, Plaintiff argues that the ALJ relied on erroneous vocational expert testimony at step five of the sequential analysis. In particular, Plaintiff challenges the ALJ's finding that she is capable of performing the jobs of "marker" and "assembler," both of which are identified as involving a reasoning level of two on the Dictionary of Occupational Titles ("DOT") six-level scale. Plaintiff notes that a reasoning level of two on the DOT scale requires the ability to understand and carry out "detailed but uninvolved written or oral instructions." Plaintiff contends that, because she was limited to "simple, short instructions," the vocational expert's testimony that she could perform the jobs of "marker" and "assembler," necessarily conflicted with the DOT, since those jobs involve a reasoning level of two with detailed instructions. Plaintiff further argues that the ALJ erred by failing to obtain an explanation from the vocational expert for this conflict. See, e.g., Henderson v. Colvin, 643 F. App'x 273 (4th Cir. 2016).

However, the Court need not resolve this issue in light of the vocational expert's identification of a third job, "bottling line attendant," which is clearly identified in both the hearing transcript and the ALJ's decision as involving a reasoning level of one. (Tr. at 24, 69); see also DICOT 920.687-042, 1991 WL 687971 (identifying both the reasoning and specific vocational preparation ("SVP") for the job as "Level 1"). A reasoning level of one on the

14

DOT scale requires only the ability to "apply commonsense understanding to carry out simple one- or two-step instructions." The vocational expert testified that 125,000 bottling line attendant jobs exist in the national economy. (Tr. at 24, 69); see Critchley v. Colvin, No. 5:15-cv-08288, 2016 WL 3030211, at *8 (S.D.W. Va. May 4, 2016) (collecting cases) (finding that even 5000 jobs in the national economy constituted a significant number).

Plaintiff nevertheless contends that the DOT's description of a bottling line attendant's duties creates a second, unresolved conflict with the vocational expert's testimony. Specifically, Plaintiff contends that, because the job "requires the worker to use glues and/or pastes," it could potentially expose her to pulmonary irritants (Pl.'s Br. at 15), but her RFC instructs that she "should avoid concentrated exposure" to such irritants (Tr. at 17). However, upon review of the DOT job description, it is apparent that no conflict exists. For the job of bottling line attendant, the DOT clearly states that "atmospheric conditions" are "not present," DICOT 920.687-042, 1991 WL 687971. The Social Security Administration defines "atmospheric conditions" as environmental conditions that involve "exposure to such conditions as fumes, noxious odors, dusts, mists, gases, and poor ventilation, that affect the respiratory system, eyes, or the skin." Dictionary of Occupational Titles, Appendix D. Thus, according to the DOT, conditions involving exposure to fumes or odors that affect the respiratory system are "not present" for the job of bottling line attendant, and there would be no apparent conflict between the DOT and the RFC providing that Plaintiff should "avoid concentrated exposure to pulmonary irritants." Accordingly, the ALJ was not required to elicit further testimony on this point.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #10] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #13] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 28th day of July, 2017.

/s/ Joi Elizabeth Peake
United States Magistrate Judge